UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KRISTAL CARRASCO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Case No. 1:11-cv-01063-TWP-DML |
| HUNTINGTON NATIONAL BANK, ) | |
| ) | |
| Defendant. ) | |

### ENTRY ON MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendant Huntington National Bank's ("Huntington") Motion for Summary Judgment (Dkt. 35) filed against Plaintiff Kristal Carrasco ("Ms. Carrasco"). Ms. Carrasco brought claims against Huntington for employment discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981 ("§ 1981"), alleging that Huntington violated her rights when it terminated her employment because of her race and gender. Ms. Carrasco also brings this action against Huntington for violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* Huntington asserts that Ms. Carrasco has failed to produce evidence sufficient to establish a *prima facie* case under Title VII, § 1981 and the FMLA. For the reasons set forth in this Entry, Huntington's Motion for Summary Judgment (Dkt. 35) is **GRANTED**.

### I. BACKGROUND

The following material facts are not in dispute for purposes of this motion and are viewed in the light most favorable to Ms. Carrasco as the nonmoving party. *See Luster v. Ill. Dept. of Corrs.*, 652 F.3d 726, 728 (7th Cir. 2011). Ms. Carrasco, a Latino female, was originally hired by Huntington's predecessor, Union Federal Bank, as a part-time bank teller on May 27, 2005.

Sky Bank acquired Union Federal on October 17, 2006, and Huntington acquired Sky Bank on July 1, 2007; thus, Ms. Carrasco became an employee of Huntington on July 1, 2007. In the summer of 2009, Ms. Carrasco was promoted to the position of Senior Teller at Huntington's Esquire Plaza branch in Indianapolis, Indiana. Her supervisor, Teller Team Leader Mike Robison ("Mr. Robison"), recommended Ms. Carrasco for the promotion to the Senior Teller position. At the time of Ms. Carrasco's termination, the Branch Manager for the Esquire Plaza branch was Matthew Singleton.

As a Senior Teller, Ms. Carrasco was responsible for providing personalized customer service and for accurately processing banking transactions in compliance with all retail policies and procedures of the bank. Huntington also expected Ms. Carrasco to comply with legal and regulatory requirements, follow effective controls and processes to ensure risks are measured, adhere to monitoring and control requirements on an on-going basis, and keep abreast of risk-related changes that impact assigned work functions and processes. Huntington provided Ms. Carrasco with copies of its retail banking policies, including its Loss Prevention Incidents Policy. These policies were also available via an intranet website, which Ms. Carrasco had bookmarked on a favorites tab to make frequently used policies easily accessible, including Huntington's policy regarding placing holds on checks. Ms. Carrasco acknowledged receiving Huntington's policies.

**A.     Huntington's Retail Banking Policies**

    **1.     Huntington's Hold Policy**

Huntington's Hold Policy required bank tellers to complete a Hold Referral Form and submit it to the Holds Desk under a number of circumstances, including if the checking or savings account was less than thirty days old or if there were insufficient funds in the account to

cover the check. For split deposits, if the cash back portion of the deposit exceeded 50% of the total deposit, the entire deposit could be subject to a hold. Huntington's Hold Policy was designed to prevent a depositor from withdrawing deposited money until Huntington could verify whether there were sufficient funds in the issuing institution to cover the amount of the deposit.

Hold referral forms were required to be submitted at the time of the deposit. After a teller submitted the hold referral form, the teller received a confirming e-mail from the Hold Desk; if the teller did not receive a confirming e-mail, the hold had not been placed. Any decision not to place a required hold had to be reviewed and approved by a supervisor, and the supervisor had to initial the check being deposited without the hold. Ms. Carrasco was also aware of Huntington's Hold Policy and kept a paper copy of the Instructions to Complete the Hold Referral Form at her desk.

2. **Huntington's Known Customer Policy**

With one exception, all Huntington customers were required to present identification when transacting business with the bank. The exception to this requirement is Huntington's "Known Customer Policy." A teller was permitted to bypass the identification requirement pursuant to the Known Customer Policy if four requirements were met: (1) the customer had maintained an account with Huntington for a minimum of six months; (2) the teller knew the first and last name of the customer; (3) the teller knew where the customer lived or worked; and (4) the teller knew where to reach the customer. Under Huntington's Check Cashing Policy, customers who did not meet the requirements of the Known Customer Policy were required to provide a form of primary identification prior to completing any check cashing transactions, while non-customers were required to provide two forms of identification. This policy also

applied to split deposits where a customer wished to have part of a check credited to an account and the remainder paid out in cash.

The Known Customer Policy allowed Huntington to maintain a personalized level of service while still guarding against losses to the bank, as well as comply with the Bank Secrecy Act ("BSA"). Under the BSA, Huntington was responsible for ensuring it knows the identity of all of its customers and documenting that identity. Ms. Carrasco was aware of and understood the requirements of Huntington's Known Customer Policy.

**B.     Ms. Carrasco's Performance Issues**

Ms. Carrasco experienced performance issues on several occasions during her employment at Huntington related to violations of the Hold Policy, the Known Customer Policy, the Check Cashing Policy, and the Deposit Processing Policy. On November 4, 2008, Ms. Carrasco processed a check deposit but failed to place a required hold on the account in violation of Huntington's policy. The incident resulted in a $5,648.55 loss to Huntington because there were insufficient funds to cover the returned check. After this incident, Ms. Carrasco was placed on a 60-day Individual Improvement Plan ("IIP") by her then supervisor, Teller Team Leader Sherry Fought.

On October 8, 2009, Ms. Carrasco was placed on another IIP, this time for 75 days. Ms. Carrasco received this IIP due to her failure to accurately balance her cash drawer, leading to a cash shortage of $724.04. Approximately one year later, on October 1, 2010, Ms. Carrasco was placed on another IIP lasting through the end of 2010 for policy violations regarding a check deposit. In this instance, Ms. Carrasco accepted a check deposit in the amount of $3,000.00, but failed to successfully place a required hold on the check. Ms. Carrasco attempted to place a hold on the check pursuant to Huntington's policy, but did not receive a confirmation e-mail from the

Holds Desk.  There were insufficient funds to cover the check, and Huntington incurred a loss of $1,500.00.  The IIP specifically stated that any future losses resulting from Ms. Carrasco's failure to follow policies and procedures could result in further disciplinary action, up to and including termination.  Ms. Carrasco reviewed this IIP with Mr. Robison, and was aware that any further policy violations could result in her termination.

Less than two weeks after being placed on the October 1, 2010 IIP, Ms. Carrasco once again ran afoul of Huntington's policies, this time by processing three split deposits for the same new, unknown customer without requesting identification. Lynn Reed ("Ms. Reed") was working at the branch as a Personal Banker on October 12, 2010, the day the first transaction occurred, and had just completed opening a new account for the customer.  Huntington admits, for purposes of this summary judgment motion only, that Ms. Reed had supervisory authority over Ms. Carrasco at the time and had the authority to mark the customer, who was otherwise an unknown customer under Huntington's policies, as a "Known Customer."  Because Ms. Reed had just checked the customer's identification when opening his account, she told Ms. Carrasco to go ahead and process his transaction without checking his identification.  The same customer came into the branch two more times, and each time Ms. Carrasco overrode the computer system and marked him as a Known Customer, despite the fact that he did not meet the requirements of a Known Customer because he had only recently opened an account.  However, Ms. Reed did not initial any of the three checks, as would have been required to override the Known Customer Policy for an unknown customer, and Ms. Carrasco did not get seek approval from Ms. Reed, or any other supervisor, on the second and third transactions.  Huntington sustained additional losses as a result of the transactions.

On October 25, 2010, Huntington Security Investigator Kenneth Brown alerted West Area Operations Manager Joyce Poole ("Ms. Poole") that there may have been a policy violation based upon losses experienced by Huntington as a result of Mr. Carrasco's actions on October 12, 2010. Ms. Poole was responsible for coaching on, informing on, and inspecting adherence to corporate standards and guidelines for her area and acted as a liaison between Human Resources and the branch when a loss was discovered. Ms. Poole was also responsible for determining whether a policy had been violated and reporting that violation to Human Resources. Based upon Ms. Poole's investigation, she determined that Ms. Carrasco had, in fact, violated Huntington's Known Customer Policy. Ms. Poole informed the Esquire Plaza Branch Manager Mr. Singleton, the Teller Team Leader Mr. Robison, and the Senior Human Resources Generalist Sherri Dorsey about Ms. Carrasco's Known Customer Policy violations. Based upon her history of mistakes and the short period of time that had lapsed between her October 1, 2010 IIP and the newest violations, Mr. Robison recommended that Huntington terminate Ms. Carrasco. After Mr. Robison consulted and came to consensus with Mr. Singleton and Ms. Dorsey, Mr. Singleton and Ms. Dorsey met with Ms. Carrasco on November 1, 2010 to inform her that her employment was terminated.

C.   **Ms. Carrasco's Request for FMLA Leave**

In June 2010, Ms. Carrasco sent an e-mail to Ms. Dorsey in the Human Resources department, informing Ms. Dorsey that she was pregnant and due to deliver at the end of November. Ms. Dorsey did not respond to Ms. Carrasco's e-mail; however, Ms. Carrasco also contacted Huntington's third-party leave administrator, Unum Group ("UNUM"), to inform them that she would be taking FMLA leave, and she was verbally informed of what she would need to do to take FMLA leave. On October 11, 2010, Ms. Carrasco received her Notice of FMLA

6

Eligibility from UNUM approving her FMLA leave. Ms. Carrasco also coordinated with Mr. Robison to schedule her remaining Paid Time Off days before her leave began and before the end of the calendar year. However, Ms. Carrasco was terminated on November 1, 2010, before her need for leave began.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat the motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). "[N]either the mere existence of some alleged factual dispute between the parties . . . nor the existence of some metaphysical doubt as to the material facts . . . is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

### III. DISCUSSION

Ms. Carrasco alleges that she was subjected to disparate treatment based upon her gender and race when she was terminated for violations of Huntington's retail banking policies, alleging that similarly situated employees outside of her protected class were not subject to the same discipline for policy violations. Furthermore, Ms. Carrasco alleges that Huntington interfered with the exercise of her rights under FMLA by terminating her employment. Huntington has moved for summary judgment on all counts in Ms. Carrasco's Complaint. For the reasons discussed below, the Court finds that Ms. Carrasco has failed to show that there is a genuine issue of material fact in establishing a *prima facie* case for each of her claims.

**A.     Disparate Treatment Claims**

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Ms. Carrasco has also alleged discrimination in violation of 42 U.S.C. § 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." The applicable legal standards on liability for race discrimination are the same under Title VII and § 1981. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004); *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1028 (7th Cir. 2004). Plaintiffs alleging discrimination under Title VII or § 1981 may prove such discrimination using either the direct or indirect method of proof. *Andonissamy v. Hewlett–Packard Co.*, 547 F.3d 841, 849–50 (7th Cir. 2008). The direct method requires that the plaintiff produce evidence that the defendant was motivated by animus toward a protected

class when she suffered some adverse employment action. *Id*. If a plaintiff cannot present direct evidence of discrimination, she may pursue her claim using indirect evidence. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the indirect method, a *prima facie* case for disparate treatment discrimination requires a showing that: (1) the plaintiff is a member of a protected class; (2) she was meeting the employer's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a "similarly situated" non-protected class member. *Farrell v. Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005); *Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011). If the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to articulate a non-discriminatory reason for the adverse employment action. *Sun v. Bd. of Trs. of the Univ. of Ill.*, 473 F.3d 799, 814 (7th Cir. 2007). If the defendant does so, the burden shifts back to the plaintiff to submit evidence demonstrating that its explanation is pretextual. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). To establish pretext, a plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions in [defendant's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [defendant] did not act for the asserted non-discriminatory reasons." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007). Because Ms. Carrasco has offered no direct or circumstantial evidence in accord with the direct method to establish her disparate treatment claims, she must rely upon the indirect method. The parties do not dispute that Ms. Carrasco can satisfy the first and third elements of her *prima facie* case; however, the issue is whether Ms. Carrasco can show that she was meeting Huntington's legitimate employment expectations at the time of her termination,

and whether she was treated less favorably than similarly situated male and non-Latino co-workers.

Ms. Carrasco asserts claims for race and gender discrimination in Counts I, II and V of her Complaint, alleging that non-Latino males were not terminated for similar violations of Huntington's policies and that her race and/or gender were the reason for her termination. Huntington argues that Ms. Carrasco cannot meet the second prong of her *prima facie* case because she cannot show that she was meeting their legitimate employment expectations, and also that she cannot meet the fourth prong because she cannot point to a similarly situated employee outside of her protected class that was treated more favorably.

### 1. Ms. Carrasco failed to meet Huntington's legitimate employment expectations

An employee may only call into question the veracity or motives of her employer if she first demonstrates that she was meeting the employer's legitimate employment expectations at the time she was terminated. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1064 (7th Cir. 2003); *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545-46 (7th Cir 2002). "If a plaintiff fails to demonstrate that she was meeting her employer's legitimate employment expectations at the time of her termination, the employer may not be 'put to the burden of stating the reasons for [her] termination.'" *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 328 (7th Cir. 2002) (*quoting Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997)).

Despite a well-documented history of policy violations, Ms. Carrasco claims that she was meeting Huntington's legitimate employment expectations, arguing that she should not have been placed on the October 1, 2010 IIP because she did attempt to place a hold on the check, and secondly that she was following the instructions of a supervisor when she violated the Known Customer policy three times, and that she would not have been terminated for this final violation

had she not been placed on the October 2010 IIP. Ms. Carrasco's arguments are unavailing, and the undisputed evidence does not support her assertion that she was meeting Huntington's legitimate employment expectations.

With regard to the violation of the Hold Policy resulting in the October 1, 2010 IIP, Ms. Carrasco argues that she attempted to place a hold on the check by sending a message to the Holds Desk, but that she never received a reply e-mail confirming that the hold had been placed. Further, she argues that this same lack of confirmation has happened to other tellers, but they were not put on an IIP. Ms. Carrasco does not cite to any evidence, aside from her own deposition testimony, showing that other tellers violated the Hold Policy in the same manner but were not placed on an IIP. Under Federal Rule of Civil Procedure 56(e), parties may only rely upon competent evidence that would otherwise be admissible at trial to raise a question of fact. "[A] party may not rely upon inadmissible hearsay in an affidavit or deposition to oppose a motion for summary judgment." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). Ms. Carrasco's deposition testimony states "Tina and Leo and everybody also vouched that it has happened to them, too, that they had a hold that never took place." Carrasco Dep. 106:5-7, Dkt. 45-1 at 5. Because this statement was not made by Ms. Carrasco but is being used to prove the truth of the matter asserted—that other tellers had problems placing holds—such evidence constitutes hearsay under Federal Rule of Evidence 801(c) and would not be admissible under Rule 802. Therefore, Ms. Carrasco cannot rely upon this evidence to show that there is a question of material fact regarding whether she was meeting Huntington's legitimate employment expectations.

Even assuming that Ms. Carrasco could produce admissible evidence showing that other tellers had similar problems placing holds, the undisputed evidence shows that Ms. Carrasco was

11

aware that the failure to receive a confirmation e-mail from the Hold Desk meant that a hold had not been placed, which was a violation of Huntington's Hold Policy. Carrasco Dep. 97:8-11, Dkt. 45-1 at 3. She also testified in her deposition that when tellers, including herself, did not receive a confirmation e-mail, they would have to resubmit the hold request. Carrasco Dep. 97:2 - 98:5, Dkt. 45-1 at 3. Thus, the undisputed facts show that Ms. Carrasco was aware of the Holds Policy, aware of the proper procedure to place holds, and knew that her failure to receive an e-mail confirming the hold meant that a hold had not been placed and that a request would need to be resubmitted, but nevertheless she deviated from these procedures.

With regard to the incident that ultimately resulted in her termination, Ms. Carrasco attempts to argue that she violated the Known Customer Policy at the request of her acting supervisor, Ms. Reed, and was only following orders. However, according to both Ms. Carrasco's and Ms. Reed's deposition testimony, Ms. Reed told her that she did not need to request identification from the customer for the first transaction because she had just finished opening a new account for the customer and had already checked his identification only moments before. Reed Dep. 9:5-16, Dkt. 45-1 at 3; Carrasco Dep. 121:11- 122:11, Dkt. 45-1 at 10. However, for the two subsequent transactions, Ms. Carrasco states that she just "assumed" that she did not have to request identification from the customer, but never stated that Ms. Reed specifically told her to make an exception to the Known Customer Policy by marking the customer as a Known Customer in the computer system. Carrasco Dep. 125:16-25, Dkt. 45-1 at 11; 118:9-24, Dkt. 37-2 at 50. Ms. Carrasco specifically acknowledged that she knew that the customer should have been considered an unknown customer because he did not meet the six month duration requirement for holding an account. Carrasco Dep. 122:15-17, Dkt. 45-1 at 10; 127:21-24, Dkt. 45-1 at 11. In addition, Ms. Reed did not initial any of the three checks in

question, and Ms. Carrasco acknowledged in her deposition testimony that she needed a supervisor's signature to override the Known Customer Policy, but that no such initials were on any of the checks. Carrasco Dep. 115:25 - 116:25, Dkt. 45-1 at 9; 118:9-24, Dkt. 37-2 at 50. The evidence cited by Ms. Carrasco, when viewed in a light most favorable to her, does not support her argument that she was instructed to violate Huntington's policies, only that she mistakenly assumed that she could.

In a similar case, *Fowler v. Bank One*, No. 1:05-CV-1243-LJM-WTL, 2006 WL 2583708 (S.D. Ind. Sept. 7, 2006), the court found that adherence to a bank's policies regarding the monitoring of deposits and placing holds on accounts was a legitimate employment expectation, and an employee's failure to comply with these policies does not meet the bank's legitimate expectations. "Whether there was unfairness in the severity of the measure taken against Fowler, or whether in fact a different decision could reasonably have been made as a result of the investigation, are not questions which are material to the question of pretext or to any other question which must be addressed in this lawsuit." *Fowler*, 2006 WL 2583708 at *6. Likewise, the fact that other Huntington tellers may have had problems placing holds—absent a showing that the other tellers were outside of Ms. Carrasco's protected class, a fact which she does not even address—and that Ms. Carrasco should not have been placed on the IIP, are irrelevant at this stage of the inquiry. "Employers may act for many reasons, good and bad; they may err in evaluating employees' strengths; unless they act for a forbidden reason, these errors (more properly, differences in assessment) do not matter." *Kuhn v. Ball State Univ.,* 78 F.3d 330, 332 (7th Cir.1996).

Additionally, Ms. Carrasco asserts both Ms. Dorsey and Mr. Robison could have recommended a Final Written Warning as a disciplinary action rather than termination. However,

it is not the Court's position to determine whether Huntington should have reached a different disciplinary decision as a result of their investigation into Ms. Carrasco's violation of Huntington's policies or excused her mistaken beliefs about whether she adhered to those policies. *See Wells v. Unisorce Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002) ("[C]ourts do not sit as super personnel departments to second guess an employer's facially legitimate business decisions."). The Court finds that Ms. Carrasco's arguments are not supported by the objective evidence, and she has failed to show that there is a question of fact as to whether she was meeting Huntington's legitimate employment expectations. Therefore, Ms. Carrasco cannot show that she can satisfy the second prong of her *prima facie* case

### 2. Ms. Carrasco has not shown that a similarly situated employee was treated more favorably

In addition to not being able to show that she was meeting Huntington's legitimate employment expectations at the time of her termination, Ms. Carrasco's Title VII and § 1981 claims also fail because she is unable to demonstrate that a similarly situated employee outside of her protected class, either race or gender, was treated more favorably. An employee is similarly situated if the employee is comparable to the plaintiff in all material respects. *Warren v. Solo Cup Co.*, 516 F.3d 627, 630-31 (7th Cir. 2008). "In the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (*quoting Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) (internal citations omitted)).

Ms. Carrasco submitted the personnel file of an African-American male employee, Donald Robinson ("Mr. Robinson"), as evidence that a non-Latino male was similarly situated

and was treated more favorably. Dkt. 45-7. Mr. Robinson was also placed on IIPs during the time he worked as a CSR Senior, which is an equivalent position to Ms. Carrasco's Senior Teller position. However, Mr. Robinson worked in a different bank branch than Ms. Carrasco and had a different supervisor, thus he does not satisfy the first requirement for determining that he was similarly situated to Ms. Carrasco.

Additionally, Ms. Carrasco and Mr. Robinson did not engage in similar conduct. Mr. Robinson was subject to two disciplinary actions in May and August 2007, but he was working as an Assistant Branch Manager at the time, not a teller, thus was not subject to the same standards as Ms. Carrasco at the time. He was later placed on one IIP on June 21, 2010 for two acts; avoidable losses and scorecard performance. The scorecard performance related to Mr. Robinson's interactions with clients and co-workers and generation of referrals. This portion of the IIP was to remain in effect until August 6, 2010, but was later extended to September 3, 2010 as an incentive to maintain Mr. Robinson's improvement. The avoidable losses portion of Mr. Robinson's IIP was to remain in effect until January 2011. Unlike Ms. Carrasco, however, Mr. Robinson was not subject to any additional discipline for policy violations and did not cause any losses while he was subject to the IIPs, whereas Ms. Carrasco committed three additional violations two weeks after being placed on an IIP. The Court finds that Ms. Carrasco has not shown that a comparable employee outside of her protected class was treated more favorably, thus she is not able to satisfy the fourth prong of her *prima facie* case.

Because Ms. Carrasco has not presented any questions of material fact regarding whether she can prove her *prima facie* case for race and gender discrimination under Title VII and § 1981, Huntington's motion for summary judgment on Counts I, II and V of Ms. Carrasco's Complaint must be **GRANTED**.

B.  **FMLA Claims**

Count III of Ms. Carrasco's Complaint alleges that Huntington interfered with her FMLA rights when it terminated her employment subsequent to her request for FMLA leave.[1]  Under the FMLA, "covered employers" must provide an "eligible employee" with "12 workweeks of leave in a 12-month period" for certain enumerated reasons.  *Stoops v. One Call Commc'ns., Inc.*, 141 F.3d 309, 311-12 (7th Cir. 1998).  "A claim under the FMLA for wrongful termination can be brought under either a discrimination/retaliation or interference/entitlement theory; the difference is that the first type of claim requires proof of discriminatory or retaliatory intent while the latter requires only proof that the employer denied the employee his or her entitlements under the Act."  *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005).  Ms. Carrasco's Complaint alleges the latter – that Huntington interfered with her FMLA rights by terminating her prior to the start of her leave.  However, she argues in her response brief that Huntington interfered with her FMLA rights by not complying with the 5-day eligibility notice mandate under the 29 C.F.R. § 825.300(b), and that Huntington retaliated against her for asserting her FMLA rights by terminating her.

Ms. Carrasco's claim that Huntington interfered with her FMLA rights by failing to provide her with notice of eligibility within five days of her request is an issue that is first raised in her response brief, and is not specifically addressed in her Complaint.  "A plaintiff may not amend [her] complaint through arguments in [her] brief in opposition to a motion for summary judgment."  *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996).  Because the

---

[1] Ms. Carrasco also originally had a related claim under ERISA as Count IV of her Complaint, but has since filed a notice that she intends to withdraw this claim.  (Dkt. 25.)  The parties have not addressed this claim in their briefings, so the Court deems this claim abandoned.

allegation that Huntington interfered with her rights based upon a violation of the eligibility notice requirement is first raised in her response brief, the Court need not address this claim.[2]

With regard to discrimination based upon termination, however, the FMLA regulations state "[t]he Act's prohibition against 'interference' prohibits an employer from discriminating *or retaliating* against an employee or prospective employee for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220 (emphasis added); *see also Swartz v. Wabash Nat. Corp.*, 674 F. Supp. 2d 1051, 1059 n.8 (N.D. Ind. 2009) ("Since the regulations supporting the FMLA treat the terms 'discriminated' and 'retaliated against' interchangeably, the Court will reach the merits of [plaintiff's] arguments on this issue."). "The difference between the two claims is that the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006). "Although in some circumstances, a given set of facts will fall clearly into either (a)(1) or (a)(2), it appears that the lines between the two categories are not hard and fast." *Id.* (additional citations omitted).

Because Ms. Carrasco originally claimed that Huntington interfered with her FMLA rights by terminating her, and the regulations include discrimination and retaliation within the definition of interference, the Court will construe the retaliation argument in Ms. Carrasco's response brief as an interference claim as opposed to finding that she improperly attempted to assert a new claim for retaliation in her response brief. "To establish [an interference] claim, an employee must show that: (1) she was eligible for the FMLA's protections; (2) her employer was

---

[2] Nevertheless, Ms. Carrasco cannot show that she was harmed by this alleged interference. 29 C.F.R. § 825.301(e) states that interference due to the employer's botched notice exists where the failure causes the employee to suffer harm. Huntington's third-party leave administrator, UNUM, approved Ms. Carrasco's FMLA leave request and provided her with notice of eligibility well before she was scheduled to take her leave. Carrasco Dep. 142:22 - 143:15, Dkt. 45-1 at 14; 150:23-151:1, Dkt. 45-1 at 16. Because she has not alleged that she suffered any harm, Ms. Carrasco cannot show that any delay in receiving notice constituted interference.

17

covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled." *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010). However, the burden is on the employee to show her entitlement to FMLA leave by proving that she would not have been fired had she not exercised her FMLA rights. *Id.*; *see Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 443-44 (7th Cir. 2011) ("If [the employee] can demonstrate that the [employer] fired him to prevent him from exercising his right to reinstatement in his position, he can succeed on an interference theory.").

As discussed above, the Court has already established that Ms. Carrasco was terminated because she was not meeting Huntington's legitimate employment expectations. In addition, she does not point to any evidence, either direct or circumstantial, that would show that Huntington's decision to terminate her was to prevent her from taking FMLA leave. To support her claim, Ms. Carrasco reiterates her prior interference argument, claiming that Ms. Dorsey did not provide her with timely notice of eligibility after Ms. Carrasco told her about her pregnancy.[3] She neglects to mention that her FMLA leave was actually approved through UNUM, Huntington's third-party leave administrator and that she did receive her notice of eligibility several weeks prior to the date she was scheduled to begin her leave. The letter from UNUM, dated October 11, 2010, informs Ms. Carrasco that she is eligible for leave under FMLA and eligible for leave under Huntington's Medical Leave Policy. This does not constitute a "convincing mosaic" of circumstantial evidence, as Ms. Carrasco does not explain how a delay in receiving a notice of FMLA rights demonstrates that she was terminated as a result of exercising those rights. Ms. Carrasco does not assert any facts that would show that her

---

[3] This is assuming that Ms. Carrasco's first contact with Ms. Dorsey actually constituted a request for FMLA leave and not, as her deposition testimony states, for purposes of covering her position in her absence. Carrasco Dep. 141:7-23, Dkt. 45-1 at 14.

termination had a causal connection to her upcoming FMLA leave and not her repeated failures to adhere to Huntington's policies. The timing of her termination and her leave alone is not sufficient to raise a question of fact regarding whether the two were related. "Temporal proximity between an adverse employment action and a plaintiff's exercise of her statutory rights 'will rarely be sufficient in and of itself to create a triable issue.'" *Simpson v. Office of Chief Judge of Circuit Ct. of Will Cnty.*, 559 F.3d 706, 713 (7th Cir. 2009) (*quoting Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)). Although it may have been a harsh employment decision to terminate Ms. Carrasco when she was nearly nine months pregnant, because she was terminated for legitimate reasons prior to taking leave, Mrs. Carrasco has not shown that she was entitled to FMLA leave. Thus, Huntington's motion for summary judgment on Count III of Ms. Carrasco's complaint for interference with her FMLA rights is **GRANTED**.

## IV. CONCLUSION

For the foregoing reasons, Huntington's Motion for Summary Judgment (Dkt. 35) on all counts of Ms. Carrasco's Complaint is **GRANTED**.

SO ORDERED.

Date: 02/13/2013

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Amy Suzanne Wilson
FROST BROWN TODD LLC
awilson@fbtlaw.com

Heather L. Wilson
FROST BROWN TODD LLC
hwilson@fbtlaw.com

Janeen L. Feinberg
FROST BROWN TODD LLC
jfeinberg@fbtlaw.com

Michelle R. Maslowski
FROST BROWN TODD LLC
mmaslowski@fbtlaw.com

Joel Samuel Paul
RAMEY & HAILEY
joel@rameyandhaileylaw.com